**UNITED STATES ex rel. Jose CUEVAS**

**v.**

**Alfred T. RUNDLE, Superintendent.**

**Misc. No. M–3039.**

United States District Court
E. D. Pennsylvania.

Sept. 19, 1966.

Norman A. Klinger, Philadelphia, Pa., for relator.

Abner H. Silver, Philadelphia, Pa., for defendant.

HIGGINBOTHAM, District Judge.

## OPINION

The relator, Jose Angel Cuevas, has brought this petition seeking a writ of habeas corpus alleging violation of rights guaranteed under the Fourteenth Amendment to the United States Constitution. Jurisdiction is based on 28 U.S.C. § 2254. For reasons which follow it is my conclusion that the writ must be granted.

The relator contends that he is entitled to the writ because the police obtained from him a statement by deception and without first informing him of his rights to remain silent and to have the assistance of counsel. This statement was introduced at the trial where he entered a guilty plea to murder generally. The relator contends that these rights should have been accorded to him because of the ruling of the United States Supreme Court in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). The relator contends also, that he entered a plea of guilty as a direct consequence of the existence of that statement. Finally, the relator argues that he is entitled to a new trial because the Commonwealth suppressed evidence vital to his defense in violation of the rule of Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Commonwealth admits that the relator was not informed

that he could remain silent if he chose, or that he could have the services of counsel. It argues, however, that the relator was not prejudiced by the use of the statement; and, more importantly, that by pleading guilty to murder generally he waived all but jurisdictional defects which existed in the pre-trial and trial stages of his conviction.

### STATEMENT OF FACTS

On October 8, 1962, the relator participated in a dice game with one Raphael Carrasquillo. He contends that he consented to play because Carrasquillo said that he would repay him a sum of money which he had previously borrowed, if he [Cuevas] entered the game. During the course of the game the relator lost fifty dollars to Carrasquillo. The relator testified that at this point he wanted to discontinue the game and that he demanded that Carrasquillo give him the money which was owed him. Carrasquillo refused. There are serious contradictions as to what followed, however, it is established that a fight ensued during which the relator shot and killed Carrasquillo. The relator claims that Carrasquillo attacked him with a knife; other witnesses denied this. In any event, after the shooting relator rushed from the Carrasquillo home and went to his own home. After telling his wife that he had shot someone he called the police.

The relator was taken to detective headquarters and questioned. Two and a half hours after his interrogation began the relator signed a statement admitting the shooting. At no time was he warned that he could remain silent or was entitled to consult with counsel.

At trial the relator pleaded guilty to murder generally and was found guilty of murder in the second degree. He was sentenced to a prison term of seven to eighteen years. No appeal from this conviction was taken. The relator then sought to obtain a writ of habeas corpus in the state courts but was unsuccessful. Commonwealth ex rel. Cuevas v. Rundle, 418 Pa. 373, 211 A.2d 485 (1965). Hav-

ing exhausted his state remedies, he brought this action.

## I.

[■] The relator contends that the writ should be granted because evidence vital to his defense was supressed by the prosecution. He relies on the ruling of the United States Supreme Court in Brady v. State of Maryland, supra, in which it was held that the failure of the prosecution to provide the defense with evidence favorable to it, in the state's possession, was a denial of due process. The relator relies on the testimony of Herminio Toledo given at the hearing before me that two detectives so intimidated Toledo that he did not come forward at the relator's trial to give testimony which was favorable to him.

The relator's allegations of suppression of evidence must rise or fall on Toledo's testimony. There were such serious discrepancies and internal contradictions in Toledo's testimony and such further contradictions between his testimony and Cuevas' that I find it impossible to accept Toledo's testimony as credible. I therefore reject all of relator's allegations which are bottomed on Toledo's testimony. Thus, I hold that the relator has failed to meet the test outlined in Brady v. State of Maryland, supra.

## II.

[■■] The relator next contends that the rule of Escobedo v. State of Illinois, supra, applies to him and thus compels his release. The relator's trial ended on May 29, 1964, and the Escobedo case was decided on June 22, 1964. In Johnson v. State of New Jersey, 384 U.S. 719, 86 S. Ct. 1772, 16 L.Ed.2d 882 (June 20, 1966), the Supreme Court decided that the rationale of Escobedo was not to be applied retroactively, but was to be given prospective application only. In short, that it applies only to those trials which began after June 22, 1964. Thus I have no choice but to reject relator's arguments based on Escobedo. United States of of America ex rel. Dickerson v. Rundle, 363 F.2d 126 (3 Cir. 1966).

[■] Despite its ruling that Escobedo was not to be applied retroactively, the Court did enunciate the standards by which cases like the instant action are to be guided.

At the same time, our case law on coerced confessions is available for persons whose trials have already been completed, providing of course that the procedural prerequisites for direct or collateral attack are met. See Fay v. Noia, 372 U.S. 391, [83 S.Ct. 922, 9 L. Ed.2d 837] (1963). Prisoners may invoke a substantive test of voluntariness which, because of the persistence of abusive practices, has become increasingly meticulous through the years. See Reck v. Pate, 367 U.S. 433 [81 S.Ct. 1541, 6 L.Ed.2d 948] (1961). That test now takes specific account of the failure to advise the accused of his privilege against self-incrimination or to allow him access to outside assistance. See Haynes v. State of Washington, 373 U.S. 503 [83 S.Ct. 1336, 10 L.Ed.2d 513] (1963); Spano v. People of State of New York, 360 U.S. 315 [79 S.Ct. 1202, 3 L.Ed.2d 1265] (1959). Prisoners are also entitled to present evidence anew on this aspect of the voluntariness of their confessions if a full and fair hearing has not already been afforded them. See Townsend v. Sain, 372 U.S. 293 [83 S.Ct. 745, 9 L.Ed.2d 770] (1963). *Thus while Escobedo and Miranda provide important new safeguards against the use of unreliable statements at trial, the nonretroactivity of these decisions will not preclude persons whose trials have already been completed from invoking the same safeguards as part of an involuntariness claim.* [86 S.Ct. at p. 1779]. (Emphasis added.)

Thus the circumstances under which the relator's statement was obtained must be ascertained and weighed against the standards set forth in *Haynes* and *Spano* to determine its voluntariness. Unlike the tests of *Escobedo* and *Miranda* the fact that a suspect is not warned of

certain rights will not automatically vitiate any statement that he might give, but will require a weighing of all the circumstances surrounding the manner in which it was obtained.

In Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202 (1960), the United States Supreme Court reversed the conviction of a defendant, because it concluded that his will had been overborne by "official pressure, fatigue and sympathy falsely aroused." The two most salient factors which underlay the result in *Spano* were (1) that the petitioner had requested the advice of counsel whom he had already retained and (2) that the police had employed a friend of his, who was a patrolman, to arouse his [Spano's] sympathies through patently false statements. In Haynes v. State of Washington, 373 U.S. 503, 83 S. Ct. 1336 (1963) the Supreme Court invalidated the conviction of a petitioner who signed an incriminating statement after he had been held incommunicado for several hours and refused permission to call his wife.

What then are the circumstances which led to the relator's statement? The relator is a Spanish-speaking native of Puerto Rico whose command of the English language is limited.

The psychiatric study which was made of the relator at the time of his trial, and which has been made a part of the record of this proceeding, produced the following conclusions: The relator has had a history of seizures since his childhood and his formal schooling ended at the seventh grade. He was beaten on the head with a resulting loss of consciousness on at least three occasions. He often suffered from nightmares of people chasing him and attempting to kill him. In 1953 he was jailed in Louisiana and confined for a period of more than seven years; while there he suffered from great physical abuse. He was hit on the head with a baseball bat and blackjacked on several occasions. He was whipped on several occasions.

Dr. Hannan, who examined the relator observed that:

> He seems to * * * behave as a mental defective * * * [H]is affect was inappropriate, he seems not to understand the delicate situation [of] being charged with murder. * * * He admits to having auditory hallucinations at times; he is delusional about being persecuted, maltreated, and maltreated in the south only because he is a Puerto Rican. Memory and general information poor. Judgment and reasoning very defective. Insight quite limited. * * * Schizophrenic reaction, chronic paranoid type superimposed to a chronic brain syndrome with some mental retardation.

It is against this background of poor and limited education, limited intelligence and mental disorders that the relator's interrogation and subsequent statement must be viewed.

One of the important factors in the Supreme Court's decision in *Spano* was the fatigue of the petitioner after hours of questioning. In the instant action the relator was only questioned for "a few hours" before he gave the statement, however, we must take into account the fact that the relator had not slept for many hours preceding his arrest.[1] Both

1. The following is an excerpt from the testimony of Miss Audley Moore, the relator's former wife, at the hearing of October 8, 1965.
By Mr. Klinger:
 Q. Miss Moore, as the record shows, the crime occurred in the early hours of Monday morning late Sunday night or early Monday morning. To the best of your recollection when was the last time that Jose had slept a night's sleep? Let's go back step by step. The crime occurred early hours of Monday morning.
 A. Yes.
 Q. Had he gone to sleep at any time during Sunday?
 A. No, sir.
 Q. Did he sleep on Saturday night?
 A. No, sir.
 Q. Why not?
 A. He went—here again it was a case of misunderstanding. I told Jose

the relator and his former wife testified that he had had little sleep for at least two days, preceding the taking of the statement. It is undisputed that the relator was arrested early in the morning of October 8, 1962, and he did not sleep until after he had given and had signed the written confession, which would place his earliest opportunity for sleep at approximately 7:00 to 8:00 A.M. Accordingly, the relator was undoubtedly fatigued at the time of the confession.

The relator contends, also, that one of the factors which induced him to give the statement was his fear of the police. The Commonwealth answers this claim by pointing out (1) that it was the relator himself who called the police, and (2) that by his own admission he had not been afraid of the police in Puerto Rico, Chicago and Erie County, Pensylvania, where he had been in police custody. While the record is replete with credible testimony as to mistreatment and brutality while he was incarcerated

that we were having a conference, missionary women would have a conference in Asbury Park. I was to address them, and he didn't understand what I was saying. Of course again I took it for granted perhaps he did understand. I was going to this conference to Asbury Park. I didn't come home until—I left about 2:00 o'clock in the afternoon and I didn't come home until way after 1:00, 2:00 o'clock that night. We had trouble with the car, but he didn't understand and he was very upset. He had called all of my family. He called in New York. He called the Fire Department. He called the Police Department. He called the hospitals, every hospital in Philadelphia Jose called thinking where I was. I was sick, maybe, or something happened to me.

Q. When you came home late Saturday night or early Sunday morning Jose was still up?

A. Oh, yes.

Q. How long did he stay up as far as you know?

A. Well, I talked to him several hours I believe after that, and then I dozed off to sleep.

Q. What time was that?

A. I went to my room—oh, I went to my room about 4:00 I suppose.

Q. Did Jose go to sleep?

A. He hadn't slept in his bed at all the next morning when I did awaken. I noticed that he had not. He was still dressed in the same clothes.

Q. How would you say—how would you describe Jose's ability to control his emotions, his mental attitude?

A. Well, he is very easily provoked, very easily provoked, and very easily re-regretful too about it. He would make—any mistake that Jose makes he is just contrite. Very much, you know, contrite about it. He doesn't want to hurt any-

body. He is the kindest man in the world when he is pleased.

The following is an excerpt from the testimony of the relator, Jose Cuevas, at the hearing of October 8, 1965:

By Mr. Klinger:

Q. When was the last time before the the crime that you slept? Let's go back step by step. The crime happened early Monday morning about 1:50 A.M.

A. Saturday.

Q. Wait. Did you sleep during Sunday?

A. I don't sleep much.

Q. Did you sleep Saturday night?

A. And Saturday I was worry, call her from one place to the other to see where my wife was, had accident with the car. It was very late. I don't want to sleep at all by the time.

Q. What time did she come home?

A. I cannot remember. Very early, early part.

Q. Early Sunday or early Saturday?

A. Closer—

(Question repeated through the interpreter.)

A. About 1:00 A.M. It was very early that morning.

Q. Did you sleep that night after she came home?

A. I don't sleep at all. I was laid down on the sofa. I can't go to sleep at all. I was so very upset.

Q. Why were you upset?

A. Because I thought my wife have an accident, and she spoke on some kind of committee some place. I can't find the place exactly where she was, and after I found what is wrong—

Q. Did you sleep Saturday during the day, the daytime?

A. The daytime, no, sir. This happened Saturday. I no sleep in the daytime, never sleep much in the daytime.

in Louisiana,[2] there is not the slightest evidence in this case of any physical brutality or threats of brutality by any Philadelphia police officers; and accordingly, I reject his argument that one of the factors which induced him to give this statement was fear of the police.

2. The following is an excerpt from the testimony of Miss Audley Moore at the hearing of October 8, 1965. Miss Moore had testified that she met the relator while doing "missionary" work at Angola, which is the penal colony in which the relator was incarcerated. The following colloquy then occurred.

By Mr. Klinger:

Q. Of your knowledge after you met Jose how would you say he was treated while incarcerated?

A. Oh, Jose had been treated terribly, sir. In talking with him, and I saw all the irons they had put him in irons which he still had the prints. They had him like this with his hands up against the wall like Jesus and his feet, irons at his feet, and also he had been beaten. I visited with him and the warden said to him, "What do you want with that nigger" or something to the effect.

Mr. Silver: Sir—

The Witness: And it seems that he got into altercations with him on that.

The Court: Excuse me. Whenever you hear someone say they have an objection, stop.

What is your offer of proof.

Mr. Klinger: The relevance of the testimony introduced at this time is to show a mental and physical predisposition to police authority by the relator supported by psychiatric evidence, part of the record introduced by the Commonwealth when they decided he could stand trial. We will show this man above all men I know of in recent cases deserved the assistance of counsel at the time he signed the confession.

The relator, himself, at the same hearing testified as follows:

By Mr. Klinger:

Q. He wants to hear you. You said they beat you when you were in prison?

A. The police, when they arrested me in '53 for this marihuana, the police beat me and treat me bad and beside that they busted my head many place.

Q. While you were in the penitentiary?

A. In the penitentiary. I cannot understand the English very well. Say, "the warden want to see you." When I go in to see the warden they kick me out of the office say, "We don't want to see you." Throw me out and everybody take advantage, and I was very upset.

Q. Beat you on the head. Anywhere else?

A. Yes, on the whip all over my body.

Q. Where?

A. In the front and—because that is a pretty bad place. They put a chain and handcuff and stuff, and I got all the scar from the body all over from how they whipped me, and in fact I cannot understand the English. I just blow up. I don't know, everybody take advantage of me in this moment, and I was very upset. They take advantage. They take me to the State Hospital and they give me 20 shock treatment for no—

Q. Shock treatment?

A. Shock treatment for no reason, and they sent me back to the—to the penitentiary again and all these I was suffer very much and I don't have no hate for nobody in that moment. When I meet my friend lady that she tried to do the best she can to help me out, and, in fact, and this morning I was classified white and the whites don't want me all together with them. And the other part they call all kinds of names, very nasty names. So, even though the warden don't let me see her in the fact they classify me in the white side and she is —that she is colored. The segregation barrier is very strict there.

Q. Did you ever spend any time in solitary confinement?

A. Oh, yes.

Q. How many times?

A. I had maybe 20, 50 times, something like that. Very bad. Sleep on the floor.

Q. How big was the cell?

A. Oh, a small cell. No toilets. They got a little hole just to—no water. Many, many times.

Q. What kind of food?

A. They don't feed you. 30 days bread and water.

Q. Bread and water?

A. Yes, because I can't understand. They call the hole.

Q. They call it the hole?

A. They call it the hole, and they feed you nothing but bread, three slices of bread and three cups of water every day. No bed, no mattress, no nothing.

While I have rejected his argument of fear, I must find that under the facts of this case there is credible and plausible evidence which suggest deception by some police officers while relator was being interrogated. Relator alleges that he was confused when he was being in-

terrogated by the police and that before signing the statement he asked for the advice of a lawyer and, even more important, to speak with his wife. The police, he says, refused to permit him to do so.

They promised instead to call his wife themselves. He claims that they spoke with his wife and reported that she wanted him to sign the statement. It was because of this message, he contends, that he signed the statement. Detective Press who interrogated the relator and took the statement denied these allegations at the habeas corpus hearing and maintained that it was not the policy of the detective bureau to make calls for suspects.[3] Were it simply a matter of balancing the testimony of Detective Press against that of the relator I would be inclined to credit the former. The relator's testimony in many other respects appears to me unreliable, however, the testimony of Audley Moore, his former wife, appeared to me reliable in all essential respects. She appears to me as a woman of conviction and character, and I was impressed by her religious beliefs and acts of charity. It was her testimony that a phone call was made to her by the police and that she explicitly told them that the relator was not to sign any statement.[4] I give credence to her testimony and find that the police did phone

3. The following is an excerpt from the testimony of Detective Harry Press at the hearing of November 12, 1965.
By Mr. Silver:
Q. Now during this period of time [the interrogation] did you or do you know if any of your fellow officers made any phone calls with reference to this particular case for any purpose.
A. I made no phone calls, and to my knowledge none of my co-workers made any phone calls. It is not the practice to make phone calls for defendants.
By Mr. Klinger:
Q. You said it is not the practice to call a defendant's wife in these kinds of cases. Do you recall saying that a few minutes ago?
A. I think I said it is not our practice to make phone calls.
Q. To make phone calls. Is that true even when you are requested to make a phone call?
A. If a defendant requests to make a phone call we usually give him access to a telephone, and if necessary we will dial for him. I recall on occasion when I have spoken to defendants, but we don't make phone calls for defendants.
Q. Would you make a phone call if it would procure a signature to a confession?
A. I don't think so, sir. I personally wouldn't.
Q. If you as an officer thought that on the advice of the family the defendant would sign a confession would you make such a phone call?
A. If the defendant himself wouldn't sign it I wouldn't want anyone else to sign it in my presence.
Q. If the defendant told you, "I would like to know what my family thinks," would you make a phone call?

A. No, sir, not for that purpose I wouldn't.

4. The following is an excerpt from the testimony of Miss Audley Moore at the hearing of October 8, 1965:
By Mr. Klinger:
Q. When he was taken away from the house did you subsequently receive a telephone call from Detective Headquarters?
A. I received a call, yes, sir.
Q. What was the conversation about?
A. It was about a statement that I understood that this officer wanted Jose to sign.
Q. And what did you say?
A. Oh, I told him he should sign nothing without a lawyer.
Q. You told this to the detective?
A. I told him he has no lawyer. Jose has no lawyer; he should sign nothing.
Q. Was the confession read to you?
A. Yes, sir, a confession was read to me or a statement, rather.
Q. Did you tell the detective on the phone that he was to go to Cuevas and tell Cuevas that he was to sign the confession and then you would get him a lawyer?
A. No, sir; no, sir.
By Mr. Silver:
Q. This telephone call that you are supposedly to have received from an officer, do you know what officer made the call to you?
A. No, sir.
Q. You just received a call?
A. Yes.
Q. Did he tell you his name?
A. No, sir—well, he may have. I wouldn't say that he didn't.
Q. Do you remember whether or not —what time this telephone call was made?
A. It was early in the morning, like, you know, about 6:00 or 7:00. I wouldn't

her and deliberately distorted her message to the relator. It is also worthy of note that although Detective Press denied making a telephone call he did not explicitly deny that a call might have been made by another officer.

It is my conclusion, that given the type of individual that the relator appears to be, his emotional state and his obvious reliance on his then wife, had the police relayed her message accurately he would not have signed the statement. Their failure to relay the message accurately had the same effect as did the failure of the police in *Haynes,* supra, to allow the suspect access to his family.

\* \* \* The petitioner at first resisted making a written statement and gave in only after consistent denials of his requests to call his wife, and the conditioning of such outside contact upon his accession to police demands. Confronted with the express threat of continued incommunicado detention and induced by the promise of communication with and access to family Haynes understandably chose to make and sign the damning written statement; given the unfair and inherently coercive context in which made, that choice cannot be said to be the voluntary product of a free and unconstrained will, as required by the Fourteenth Amendment. (Haynes v. State of Washington, supra, 373 U.S. at p. 514, 83 S.Ct. at p. 1343.

In addition to the factors of limited intellect, fatigue, poor emotional health and police deception, I must take into account the fact that the relator was not warned of his right to remain silent and of his right to outside assistance. See Haynes v. State of Washington, supra. In Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895, the Supreme Court noted that:

The review of voluntariness in cases in which the trial was held prior to our decisions in Escobedo and Miranda is not limited in any manner by these decisions. On the contrary, the fact that a defendant was not advised of his right to remain silent or of his right respecting counsel at the outset of interrogation, as is now required by Miranda, is a significant factor in considering the voluntariness of statements later made. This factor has been recognized in several of our prior decisions dealing with standards of voluntariness. \* \* \* Thus, the fact Davis was never effectively advised of his rights gives added weight to the other circumstances described below which made his confessions involuntary. (Davis v. State of North Carolina, 86 S.Ct. at p. 1764)

It is not meaningful to characterize the relator's statement as involuntary or coerced in the sense that the police threatened him physically and thus overbore his will. Yet, in a larger sense it is relevant to speak of the statement having been obtained by psychological coercion. It has been recognized that psychological factors may be as coercive as physical force. See United States ex rel. Perpiglia v. Rundle, 221 F.Supp. 1003 (E.D.Pa.1963). The fact that prefatory to the transcribing of his statement the relator was asked if his statement was voluntary and answered in the affirmative does not preclude me from finding the contrary. In the words of the Supreme Court, in *Haynes:*

\* \* \* It would be anomalous, indeed, if such a statement, contained within the very document asserted to have been obtained by use of imper-

---

know what time, really. About 7:00 or something like that.

Q. About 6:00 or 7:00?

A. It was early in the morning, though, I think.

Q. Tell me exactly what the officer told you to the best of your recollection.

A. He said that he had a statement that he had prepared for Jose to sign. I asked—he asked me if I thought that Jose should sign the statement. Jose wanted my opinion whether he should sign the statement. That is what he said. So, I told him, "No, Jose should not sign any statement without a lawyer."

missible coercive pressures, was itself enough to create an evidentiary conflict precluding this Court's effective review of the constitutional issue. Common sense dictates the conclusion that if the authorities were successful in compelling the totally incriminating confession of guilt, the very issue for determination, they would have little, if any, trouble securing the self-contained concession of voluntariness. Certainly, we cannot accord any conclusive import to such an admission, particularly when, as here, it is immediately followed by recitations supporting the petitioner's version of events. (At p. 513 of 373 U.S., at p. 1343 of 83 S.Ct.)

Thus, I find that by the standards enunciated in *Haynes*, supra, the statement given by the relator to the police was an involuntary one.[5]

The Commonwealth argues that even if the statement was obtained by coercion the writ should not be granted because (1) the statement was exculpatory, and (2) there was other evidence to sustain the relator's conviction and thus the statement did not prejudice him. I have examined the statement given by the relator and I cannot say that it is clearly exculpatory. In fact it is ambiguous and susceptible of more than one interpretation. It is difficult to speak of the relator's statement as exculpatory. In fact, the relator's statement was used to impeach his testimony at his trial and thus provides further proof that it was not a mere exculpatory statement.

The Commonwealth argues that since there was other evidence to sustain the relator's conviction the writ should not be granted. It contends further that the relator would have entered a guilty plea regardless of the existence of the statement. I cannot say with any assurance that under those circumstances the relator would have entered a guilty plea. The difficulty with this case lies in the fact that relator, unlike the defendants in *Haynes*, supra, and *Davis*, pleaded guilty to the charge. The relator having entered a guilty plea was not prejudiced by the court's finding that he was guilty of second degree murder since that finding precludes a finding guilty of first degree murder. In the cases mentioned above the defendants entered not guilty pleas, therefore, it is clearer that the introduction of their confessions or previous guilty pleas prejudiced them in the eyes of the jury. Yet, it seems clear to me that the relator was prejudiced *because his plea of guilty was induced by the existence of the statement.*

At the hearing held before me, counsel who represented the relator at his trial testified that the existence of the statement was the deciding factor in his advice to the relator to plead guilty to murder generally.[6]

---

5. In the instant case, it is not necessary to make a determination as to whether relator's constitutional rights were further breached at his trial by the reading into evidence of this statement after the guilty plea was accepted. Conceivably, under certain circumstances, there may be prior constitutional violations which would not constitute the basis for granting a writ of habeas corpus, if those constitutional violations had not been the proximate cause of the entering of a guilty plea or if such violation did not affect the penalty. However, in this case we have an unusual factual nexus which makes it unnecessary to determine whether the reading of the statement at the trial was error, since there is testimony that the sole reason for the entrance of the guilty plea was because of the presumed admissibility of the statement. (See pages 656 to 657 of this Opinion.)

6. The following is an excerpt from the testimony of Charles L. Guerin, Jr., who was one of the two attorneys who represented the relator at trial.

By Mr. Klinger:

Q. All right. In your opinion, Mr. Guerin, did the introduction of the confession at trial have any effect in producing relator's guilty plea?

A. Do you mean the fact that if he had gone to trial it would have been introduced?

Q. That's right.

A. Oh, yes, I do.

By Mr. Silver:

Q. Now, Mr. Guerin, prior to the introduction of the, or the entry of the

It is obvious that the existence of the statement led to the relator's guilty plea. In determining the voluntariness of that plea we are precluded

guilty plea were you aware of what the Commonwealth's evidence was?

A. As a result of our investigation we had a very good opinion as to what the Commonwealth's evidence would probably be.

Q. Were you aware of the existence of this statement?

A. Oh, of course. We had copies of the statement.

Q. You did have copies of the statement?

A. Yes.

Q. In your opinion, sir, did this statement—relying on this statement alone, could the Commonwealth have proven a first-degree murder conviction?

Mr. Klinger: I object, Your Honor. I don't know where the question is leading.

The Court: What is the relevance of that?

Mr. Silver: Well, sir, I think we are discussing the inducement to plea. This is inherent in the entire petition, and in the allegations made. We are talking about—there has been an allegation that the existence of the confession induced the plea. There have also been allegations contained in the brief that Cuevas requested counsel prior to the interrogation. I think this is all relevant to the entire picture here * * *.

The Witness: If I remember your question now are you asking me on the basis of the confession alone in my opinion would the Commonwealth have had a first-degree case. Is that your question?

Mr. Silver: Yes; Well, may I preface this by saying, do you recall the confession?

A. I don't recall the confession in detail, but as I recall he excused himself to some degree in the confession, and as I recall on the basis of the confession and nothing else the Commonwealth would probably not have made out a first-degree case, the confession and nothing else.

Q. Now, you were aware of the fact that—

A. But the confession was a very important piece of evidence against him.

Q. Well, in what way, sir?

A. If not the most important.

Q. In what way?

A. Because it was our experience that a witness, even an eye witness can be attacked as to credibility in many ways. Whereas when you try to attack a confession at that time you were stymied.

Q. Stymied how? Well, may I ask you this—

A. You can't attack the credibility of the person who made the confession because the person making the confession is your client.

Q. Well, were you not aware of the fact that in the event that—you were aware, however, that the confession did excuse himself?

A. It is my recollection that the confession excused himself. In other words, the confession did not present as strong a case as we expected the Commonwealth to produce through other witnesses.

Q. And you were aware of the Commonwealth's other witnesses?

A. We knew the Commonwealth had other witnesses, eye witnesses.

Q. And they in fact did testify at the hearing following the guilty plea?

A. Some of them did, yes. I know that the wife of the victim for one. * * *

By Mr. Silver:

Q. Taking the circumstances as a whole and including the Commonwealth's evidence other than the existence of the confession, Mr. Guerin, had you believed that any infirmities existed in the obtaining of the confession would you have objected to the introduction at the hearing following the guilty plea?

A. That question is difficult to answer because your question is would we object to its introduction at the hearing following the guilty plea.

Q. Yes, sir.

A. That is your question.

Q. Yes, sir.

A. Now if we thought that there were infirmities in it so that it could have been excluded we probably would have advised him not to plead guilty. So, we would not have reached that stage.

Q. Even in your view of the knowledge of what the other Commonwealth's evidence was?

A. We knew that there were eye witnesses, but we did not know what they would testify to, but we knew what the confession said. If we thought that the confession could be excluded I am sure we would have advised him to plead not guilty rather than guilty.

from considering the guilt or innocence of the defendant. See United States ex rel. Perpiglia v. Rundle, supra.

## III.

██ The Commonwealth contends, however, that by pleading guilty the relator waived all non-jurisdictional defects in his arrest and trial. It contends also that the guilty plea was entered voluntarily with full understanding of its implications. It is the Commonwealth's contention that the relator waived his right to challenge the voluntariness of his confession by his plea of guilty. Finally it contends that the relator's failure to challenge his confession was a choice made by counsel and is binding here. It is the general rule that a plea of guilty forecloses a defense, but it does not prevent a subsequent inquiry into whether it was freely and voluntarily entered. Waley v. Johnston, 316 U.S. 101, 62 S.Ct. 964, 86 L.Ed. 1302 (1942). The fact that a defendant [as did the relator here] in open court says that his guilty plea was not coerced does not foreclose inquiry into its voluntariness. United States ex rel. McGrath v. LaValle, 319 F.2d 308 (2 Cir. 1963).

Thus, we are faced with a twin problem, one to ascertain whether he waived his right to attack the voluntariness of the statement and, two, whether his guilty plea was entered voluntarily.

██ Ever since Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L. Ed. 1461, 1938, it has been the rule that the question of a waiver of a federally guaranteed constitutional right is a federal question controlled by federal law. There is a presumption against the waiver of constitutional rights. See Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The Johnson case established that if a waiver is to be effective it must be clearly established that there was "an intentional relinquishment or abandonment of a known right or privilege." After Johnson was decided it became accepted doctrine that a defendant had to waive his

rights personally or any waiver would be ineffective. After Henry v. State of Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965), the viability of this view became questionable. In Henry, the Court indicated that a waiver made by counsel might be binding on the defendant. This statement's meaning was somewhat confused by the fact that the Court remanded the case to the Mississippi courts for an evidentiary hearing to determine whether Henry had personally concurred in his counsel's decision. Whatever doubt Henry might have created was dispelled by Brookhart v. Janis, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966) which was decided by the Supreme Court in the term just past. In Brookhart the Court found that the petitioner had not waived his right to confront and cross-examine witnesses at his trial even though his attorney had agreed to do so. It is true that in Brookhart the Court found specific evidence that the petitioner did not intend to waive his rights, however, the Court made clear what it had meant in Henry.

* * * It is true, as stated in Henry v. State of Mississippi, 379 U.S. 443, 451 [85 S.Ct. 564], that counsel may, under some conditions, where the circumstances are not "exceptional, preclude the accused from asserting contitutional claims." * * * Since we hold that petitioner neither personally waived his right nor acquiesced in his lawyer's attempted waiver, the judgment of the Supreme Court of Ohio must be and is reversed and remanded * * *. (86 S.Ct. at p. 1248.)

Clearly, Cuevas would not have known of his right to challenge the admissibility of his statement, and the fact that his attorneys (for whatever the reasons) did not do so should not bind him, where as here the evidence indicates that he did not personally make a decision to waive a challenge. I find that the circumstances were so "exceptional" that the relator should not be bound by the failure of his attorneys to challenge the admissibility of the statement.

In the instant case, we can arrive at a just result, on the question of voluntariness of the guilty plea, by examining the totality of the circumstances. See Blackburn v. State of Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). The likelihood for compulsion is apparent in the instant case when we consider the fact that the relator is a Puerto Rican with limited comprehension of the English language and a seriously troubled psyche. Without an adequate warning I cannot say that the statement and the guilty plea which followed it, were the product of an untrammeled will.

Viewed against his background the statement led to the guilty plea, and the plea cannot be characterized as truly voluntary. A case such as this illustrates, that an illegally obtained statement can be just as damaging where its existence leads the defendant to plead guilty, as in those situations where it is introduced into evidence after a plea of not guilty.

Of course by this holding I do not wish to imply that a guilty plea can never be a waiver of a constitutional infirmity. Parties who are aware of their rights can make knowing waivers of even serious constitutional breaches. I hold only that under the circumstances of this case the relator cannot be said to have waived his rights and that his guilty plea was not truly voluntary.

In making my finding of the constitutional invalidity of the guilty plea because that plea was given in reliance on the involuntary and constitutionally invalid confession, I do not mean to be critical of either the able counsel who represented relator at the trial, or the equally distinguished state judges who presided over the original proceedings and the state habeas corpus hearing. For, obviously, counsel in this case were confronted with a difficult strategic dilemma. The District Attorney did not certify to the trial judge that the case rose no higher than second degree until after the guilty plea was entered. With utmost caution his counsel advised the court as follows: "If Your Honor, please, let the record show before the defendant pleads generally guilty that the District Attorney intends to certify with Your Honor's permission that this case does not rise higher than second degree. I would like to have for the record an examination of this defendant so that he understands fully what the situation is." The defendant was subsequently fully advised of his rights to enter a not guilty plea, and, that "under those circumstances a jury could convict you of murder even up to the first degree. Do you understand that?" Defendant: "Yes."

Defendant admitted "that there had not been any promises made to you of any kind." That "there has been no threats made to you." That "you're doing this of your own free will;" that "you understand all of the situation here"; and "you're satisfied to plead guilty under those circumstances?" His reply was "that as a result of entering a guilty plea his only understanding was that "it can't go higher than second degree."

The defendant killed a man who left as survivors a wife and nine children (N.T., 179); as the District Attorney observed, *"they feel very bitter about this."* A reading of the record establishes that clearly this is a case which if submitted to a jury some juries could have, as a matter of law, returned a verdict of murder in the first degree with the death penalty.

The testimony which I have found decisive in establishing the involuntariness of the confession has been that of the defendant's former wife, Mrs. Moore. Her testimony as to the circumstances of the involuntariness of the confession had not been presented to the trial judge, and even if it had been submitted, it is possible that another finder of fact may have found her testimony not credible. Accordingly, under such a finding, the

confession would have been found to be voluntary, and if voluntary, the guilty plea would be valid. However, as I read this record, and as it relates to the present constitutional holdings of the United States Supreme Court, relator, under the unique facts of this case, had to be advised of the constitutional argument that his confession could be theoretically held to be involuntary. Without being aware of this he could not be held to have knowingly waived his right to challenge the validity of his confession.[7]

I wish to note the Court's extraordinary appreciation for the dedicated service rendered by Norman A. Klinger, Esquire, who has served as counsel for Mr. Cuevas without compensation.

## ORDER

And now, this 19th day of September, 1966, the judgment of conviction of May 29, 1964 is set aside; the writ of habeas corpus is granted.

The Commonwealth may of course appeal from this Order, or prosecute the bill of indictment in issue; if it fails to take a timely appeal, or if it does not appeal and fails to take timely action in prosecuting this matter, relator may file with the Court a petition requesting additional relief.

---

7. At the trial when the guilty plea was entered, as Detective Press was about to read the statement given by the defendant, Cuevas' counsel requested, and was granted permission by the Court to "first inquire as to the circumstance under which this was taken." (N.T., of relator's trial, May 27, 1964, p. 96). At a later time the Court stated: "This man's pleaded guilty to this, we already heard a lot of testimony this is a statement and we can get the circumstance of this statement here now in terms of anything you want, but if it's your idea that this is an involuntary statement why that will be something else." (N.T. of relator's trial, May 27, 1964, pp. 99–100). Mr. Ehrenreich: "I want to be complete, sir, that is all." (N.T. of relator's trial, May 27, 1964, Ibid.) Yet for some reason which may have been valid as a matter of tactical strategy, counsel failed to investigate the voluntariness of the state-

ment or the circumstances about which Mrs. Moore testified, in such substantial detail, in the hearing before me. Similarly, at the habeas corpus hearing in the state court, relator's counsel (Mr. Ziccardi) made the following statement at the beginning of the proceeding: "Your Honor, this case was listed before you last week, at which time it was continued generally. Mr. Cuevas requested that we contact his wife to be here. We've not contacted her. We did not have sufficient notice of the hearing. If Your Honor, after hearing what we have here, decides her testimony should be in, we will get her in." (N.T., State habeas corpus hearing, January 19, 1965, p. 2.) At the State habeas corpus hearing, counsel failed to follow up the relator's request that Mrs. Moore be present, or that the matter be continued after the completion of other testimony until the presentation of her testimony.