### UNITED STATES of America ex rel. John L. COLLINS, E–1873

v.

### James F. MARONEY, Superintendent.

### Misc. No. 3565.

United States District Court
E. D. Pennsylvania.

July 5, 1968.

Herman I. Pollock, Defender, George A. Johnson, Asst. Defender, Philadelphia, Pa., for petitioner.

Arlen Specter, Dist. Atty., Welsh S. White, Asst. Dist. Atty., Philadelphia, Pa., for respondent.

OPINION

HIGGINBOTHAM, District Judge.

Relator originally filed a petition for habeas corpus in the Western District of the United States District Court, Pittsburgh, Pennsylvania. The petition was dismissed by a Judge of that Court, and

an appeal taken to the Court of Appeals for the Third Circuit. The matter has been assigned to me following a remand by the Court of Appeals. 382 F.2d 547 (3rd Cir. 1967). Relator had been incarcerated in a state penitentiary near Pittsburgh, but the matter was remanded to this Court since all of the incidents in question and therefore all of the potential witnesses were located in Philadelphia.

In 1950 Collins pleaded guilty to murder generally and was sentenced to life imprisonment for his participation in a taproom hold-up during which a patron was struck in the head by one of Collin's accomplices and subsequently died. No appeal was taken. In 1965 Collins sought habeas corpus in the Court of Common Pleas of Philadelphia County and was denied relief without a hearing. This was affirmed by the State Supreme Court; Commonwealth ex rel Collins v. Maroney 420 Pa. 631, 217 A.2d 739 (1966). Having thus exhausted his state remedies, and being incarcerated at the State Correctional Institution at Pittsburgh, Collins filed a petition for a writ of habeas corpus in the United States District Court for the Western District of Pennsylvania. This petition, too, was denied without a hearing. On appeal, the Court of Appeals, *per curiam*, vacated the judgment of the District Court and remanded directing that a hearing be held on his allegations to determine the answers to the following four questions on which turn his right to the writ:

■ "Whether by the plea of guilty, Collins waived his right to question the constitutional infirmity of his confession. * * *"

■ "(I)f it is found that Collins did not waive his right to challenge his confession * * * whether the confession was coerced. * * *"

■ "(I)f the confession is found to have been coerced * * * whether the coerced confession induced, and thus tainted Collins' guilty plea.

■ (A)ssuming that a coerced confession did not induce the plea of guilty * * * whether the plea of guilty was voluntary * * *"

■ After a full day's hearing and extensive written briefs from counsel for the relator and for the Commonwealth, all of which have been carefully reviewed, for the reasons set out below, I conclude that (1) Collins did not waive his right to challenge the constitutional infirmity of the confession; (2) the confession was involuntary and therefore coerced,[1] and (3) the coerced confession did induce and thereby taint the plea.

### I.

At about 7 P.M., on January 16, 1950, petitioner and two associates—Frank Smith and Jesse Young—held up a taproom in Philadelphia (N.T. 14, 25)[2] During the course of the hold-up in which Collins was unarmed and acted as lookout, Smith struck one of the patrons, William Hill, on the side of the head with his gun (N.T. 22, 75–76, 79). The three men escaped with $57.00.

After being treated at St. Joseph's Hospital, Hill was returned to the police station and questioned about the robbery. During the questioning, Hill felt ill and asked to be taken back to the hospital. He collapsed as he was entering the police van and was pronounced dead on arrival at the hospital (N.T. 77–80).

Collins was arrested at about 2:30 A.M. on the morning of January 17th,

---

1. As demonstrated by the cases cited at pp. 423–424, infra, active "coercion" is not necessarily a prerequisite to the conclusion that a confession is "involuntary" and therefore inadmissible as a matter of Federal Constitutional Law.

2. Throughout this Opinion reference to notes of testimony from the trial are designed "N.T._____", and from the habeas corpus hearing before me "H.C. _____".

and taken directly to the police station at 19th and Oxford Streets (N.T. 83–84). At that time, he had been a user of narcotics for about a year and a half, and an addict for about six months (H.C. 37–38). His habit was characterized as "very heavy" (H.C. 140) by then Detective Sergeant Thomas F. McDermott, a former Chief of County Detectives with extensive experience in dealing with narcotics and narcotics addicts (H.C. 120). During the time of his narcotics addiction, Collins had never previously experienced withdrawal symptoms (H.C. 68–69). On the night of his arrest, Collins had taken his last "shot" at about 12:30 A.M. (H.C. 40).[3]

Collins was first questioned at about 3:30 A.M., on January 17th, according to his testimony.[4] At that time he neither asked nor was there any discussion of whether he could or could not have the assistance of counsel. (H.C. 42, 51). He was questioned for about one and one-half hours in the detectives' room, and then returned to a cell downstairs. About an hour later he was brought back to the detectives' room and the interrogation was resumed (H.C. 44). It was continued for about two hours before he was again returned to his cell (H.C. 45, 47). That afternoon the interrogation resumed; however, the record is unclear as to the pattern which it took. Prior to the time that any statement was made by Collins, it was clear to the police that he was a heavy narcotics user (H.C. 119).

Shortly before 6:30 P.M., Collins made an oral statement which he wrote out in longhand and signed immediately thereafter (N.T. 88–89, 136; H.C. 131, 138). The next morning another statement was taken from Collins, typed out by the police and signed by him (N.T. 92, 95, 141–143). Collins testified that he gave the statement because he was sick and in severe pain from withdrawal symptoms, that his repeated requests for a doctor were denied and that finally one of the officers—not Sergeant McDermott—told him that he could see a doctor after he made a statement (H.C. 43, 45, 46, 48, 49, 88, 91).

■■ Certainly, if Collins, while suffering withdrawal symptoms, asked for a doctor and was told that he could see a doctor after he made a statement and if because of that promise Collins made an inculpatory statement, there can be no question but that such a statement would have been involuntary. Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). However, in the view which I take of this case, I need not make a finding as to (1) whether one of the officers actually made the promise as alleged, or (2) whether Collins being sick and focusing on getting relief, merely thought—though erroneously—that such a promise had been made, or (3) whether Collins' testimony concerning the alleged promise was knowingly false.[5] I find from the uncontradicted testimony of Dr. Frederick B. Glasser and then Detective Sergeant

---

3. While Collins characterized this as a "shot", the statement of the District Attorney at the trial of Collins and Young indicates that on their last purchase of drugs they were cheated and given soap powder instead of heroin, and that they learned about this approximately five or six hours after the holdup, or around 12:00 or 12:30 A.M. (N.T. 7). Thus, it is quite possible that the last "shot" was not a full dose of heroin.

4. There is some conflict between the testimony of Collins and of McDermott as to times involved; and, between Collins' testimony and Dr. Glasser's testimony as

to the time during which different degrees of withdrawal symptoms were experienced. However, McDermott's testimony clearly corroborated Collins' testimony as to the severity of his symptoms. Also McDermott did state that the time noted on the confession, rather than his recollection of the time at which it was made, must be correct.

5. In this respect, however, Collins specifically stated before me prior to the time Mr. McDermott appeared in court, that it was not McDermott but one of the other officers who had made the promise (H.C. 49).

Thomas F. McDermott, that when considered along with the fact of the repeated interrogation, Collins' physical and psychological condition at and before the time of the initial statement were such that his statement could not have been, and was not, voluntary.

Dr. Glasser is an assistant professor of psychology at Temple University School of Medicine who has specialized in the treatment of drug addicts and has had substantial experience in this area.

He testified that the first stage of withdrawal—running of the nose, yawning, excessive perspiration, tearing of the eyes—generally develops about eight hours after the last shot; that if deprivation is continued, at about twelve hours without drugs, the second stage develops, causing goose flesh, muscular twitching, pain and loss of appetite; and that at about eighteen hours deprivation, the third stage—insomnia, elevation of blood pressure, pulse and temperature, vomiting, diarrhea and weight loss develops (N.C. 104–105). Although Dr. Glasser did state that "withdrawal syndrome"—from an objective medical viewpoint—is about as severe as a bad case of the intestinal flu (H.C. 105), he also stated that the severity of withdrawal would depend on the length of time of addiction, and the amount of the drug that the individual had actually been receiving (H.C. 109–110). In this respect, he also testified that mild withdrawal symptoms would result from deprivation of the drug after approximately only two weeks daily dosage of 30 milligrams, but that to maintain a habit, the dosage would have to be continuously increased (H.C. 101–102).

In response to my questions, Dr. Glasser stated that the only evidence of withdrawal which he would accept would be "a statement of a physician who observed objective signs of withdrawal." (H.C. 110).[6]

More important was Dr. Glasser's statement that for an addict in withdrawal, "If he believes that by his behavior he can obtain more drugs, then he tends to *feel* extremely upset and tends to behave as if he were upset. * * *" (H.C. 103) (Emphasis added.); that the attempt to get drugs would be a major concern and that "he would be likely to do a great deal in order to get that shot." (H.C. 105).

Former Chief of County Detectives (then Detective Sergeant) Thomas F. McDermott, who participated in the interrogation of Collins, Young and Smith, testified in response · to my questions *that at the time the first statement was made Collins was "under the influence of drugs," that he had a very heavy habit and that his withdrawal symptoms were very substantial* (H.C. 139–140). He also testified that either Collins or Young requested the services of a doctor prior to the making of any statement and that all three were suffering from withdrawal symptoms at that time, (H.C. 120–121, 125) but that no attempt was made to get a doctor before the statements were taken because *"I didn't think at that time that they were as sick as they actually were, and they were sick. All three of them were sick."* (H.C. 130).

From this evidence it is evident that Collins' original oral statement, which he subsequently wrote out in longhand and signed at 6:30 P.M., on January 17, 1950, was not "the product of a rational intellect and free will" and is thus constitutionally inadmissable. Blackburn v. State of Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242; c. f., Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). To this conclusion, it is irrelevant that the police did nothing with improper purpose or that they got a police doctor as soon as they could under the circumstances then present. *Blackburn,* supra. "Any ques-

---

6. While Mr McDermott is certainly not a physician, I feel quite confident in the accuracy of the conclusions he stated based on his long experience in the field, and his personal observations of Collins.

tioning by police officers which in fact produces a confession which is not the product of a free intellect renders that confession inadmissible. * * * " *Townsend,* supra, 372 U.S. at 308, 83 S.Ct. at 754, c. f., Ziang Sung Wan v. United States, 266 U.S. 1, 45 S.Ct. 1, 69 L.Ed. 131 (1924).

Wade v. Yeager, 245 F.Supp. 62 (D. N.J., 1965) is clearly distinguishable because from the factual discussion by the State Court, as concurred in by the Federal habeas corpus judge, it is evident that in the testimony relating to the basic issues of the petitioner's condition and conduct at the time of his confession, there are obvious and material discrepancies. 245 F.Supp. at 65, 66. Thus, the primary issue was one of credibility, and the court believed the police officers and the doctor rather than the petitioner.

On the other hand, in Logner v. State of North Carolina, 260 F.Supp. 970 (M.D.N.C., 1966), the testimony of the police supported the petitioner's claim that his confession was involuntary. The Court there held:

> "The essential fact that the petitioner was under the influence of alcohol and drugs to such an extent as to affect his judgment and that he was interrogated in that condition would render the statement involuntary. * * * " 260 F.Supp. at 975.
>
> " * * * Any decision to incriminate made in the intoxicated state of petitioner could not be free and unconstrained. * * * The petitioner's will had been overborn by the alcohol and drugs. * * * [H]is capacity for self determination was critically impaired, rendering any confession gained objectionable."
>
> 260 F.Supp. at 976.[7]

That Collins' condition was brought about by the absence rather than the presence of drugs is a distinction without a legal difference.

## II.

■ The third question presented by the remand order of the Court of Appeals is "whether the coerced confession induced and thus tainted Collins' guilty plea." I have no hesitation in answering in the affirmative.

Collins was charged with murder, assault with intent to rob, conspiracy to rob, robbery and unlawful possession and use of narcotics. Milton Leidner, Esquire, a distinguished and experienced member of the bar who was retained by Collins' family and represented Collins at the time of trial and sentence, testified before me that he recommended to Collins that he plead guilty to murder generally for the following reasons:

1. Leidner believed that the death of Hill was not the result of the blow on the head nor of anything else for which Collins was responsible. (H.C. 5, 7–8, 19–20)

2. Leidner further believed that even if he succeeded in proving that Hill's death was the result of external causes, Collins would still be convicted for his participation in the robbery and for narcotics offenses *on the strength of his confession alone*—no one having positively identified Collins as one of the robbers.

3. Leidner had no knowledge nor reason to believe that the confession was obtained by duress or coercion or was otherwise inadmissible (H.C. 11, 13). Leidner believed that the judge before whom the plea would be taken and the Assistant District Attorney had agreed to place on the record at the time of sentencing their recommendation that Collins be paroled after approximately twelve years—the sentence Leidner believed Collins would get if convicted of

---

7. This view finds support in this Circuit in the recent decision of Judge Joseph S. Lord, III in United States ex rel. Smith v. Brierly, 267 F.Supp. 274 (E.D. Pa., 1967) in which he held that the Pennsylvania "tacit admission" rule violated the Fifth Amendment prohibition against involuntary confessions, stating that voluntariness requires "the active will to confess". 267 F.Supp. at 281.

the robbery and narcotics charges.[8] (H. C. 8–9, 13, 14, 23–32).

Given Mr. Leidner's view of the limited possibility of defeating the murder charge, and the fact that Collins had never been positively identified by anyone at the scene of the robbery, it seems beyond doubt that the confession not only induced, but, in fact, was the key factor leading to the determination that a guilty plea would be in Collins' best interest. Furthermore, Collins himself had no reason to believe that his confession would be inadmissible. In fact, in response to a question put by the District Attorney as to whether he felt that his treatment by the police was wrong, he replied, "No one had punched me. * * *" (H.C. 93).

Having thus disposed of the third question by determining that Collins' confession did induce the guilty plea, I need not consider the fourth question.[9]

### III.

The remaining question posed by the Court of Appeals in its remand order is "whether by the plea of guilty, Collins waived his right to question the constitutional infirmity of his confession".

In Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), the Supreme Court enunciated the clear standard for determining the waiver question: whether there was "an intentional relinquishment or abandonment of a known right or privilege." Subsequently, in Fay v. Noia, 372 U.S. 391, 439, 83 S.Ct. 822, 849, 9 L.Ed.2d 837 (1963), the Court explained that in order to satisfy the Johnson v. Zerbst test, the federal court on habeas corpus had to determine that the relator con-

sulted with competent counsel concerning the putative constitutional infirmity, and thereafter "forewent the privilege of seeking to vindicate his federal claims in the state courts (for) * * * any * * * reasons that can fairly be described as the deliberate bypassing of state procedures * * *."

■■ There is no evidence on this record to indicate that either Collins or his attorney knew or had reason to know that the confession might have been challenged successfully. It is inconceivable to me that an attorney of Mr. Leidner's ability and experience, knowing or believing that the only thing standing between his client and an acquittal was a confession, and knowing that the confession had been obtained when his client was violently ill from narcotics withdrawal would have recommended a plea of guilty. Consequently, I must find, as Mr. Leidner testified, that he did not know the facts surrounding the confession. Moreover, there is nothing in the record to indicate that Collins himself would have known the legal relevance of those facts and kept them from his attorney in order to raise them subsequently in a federal habeas corpus proceeding. Consequently, I must conclude that the test of Johnson v. Zerbst, as clarified in Fay v. Noia, has not been met and Collins has not "waived" his right to challenge the confession.[10] See United States ex rel. Cuevas v. Rundle, 258 F.Supp. 647 (E.D.Pa. 1966).

### IV.

Having thus found that:

(1) Collins, by his pleas of guilty did not waive his right to question the constitutional infirmity of the confession;

8. The factual background and legal propriety of this "arrangement"—if any there was—and assuming that there was, its not being carried out is not before me since Collins has never raised those issues in the State courts.

9. The fourth question assumes that the confession did *not* induce the guilty plea.

10. Having found that the confession was the lynchpin factor inducing Collins' plea,

I need not consider whether the confession "in some way affected his plea of guilty". Brown v. Turner, 257 F.Supp. 734, 738 (ED N.C.1966); "induced" the guilty plea, United States ex rel. Collins v. Maroney, 382 F.2d 547 (3rd Cir. 1967); United States ex rel. Cuevas v. Rundle, 258 F.Supp. 647 (ED Pa.1966) or was "the primary motivation for his plea of guilty" Commonwealth v. Garrett, 425 Pa. 594, 229 A.2d 922 (1967).

(2)   The confession was constitutionally involuntary and therefore coerced; and

(3)   The coerced confession did induce and thereby taint the guilty plea, I conclude that the petition for a writ of habeas corpus must be granted.

I wish to note the Court's appreciation for the extraordinarily dedicated and astute service rendered by George A. Johnson, Esquire, Assistant Voluntary Defender, who represented Mr. Collins in this proceeding.

## ORDER

And now, this 5th day of July 1968, the judgment of conviction of September 20, 1950, is set aside; the petition for a writ of habeas corpus is granted.

The Commonwealth may of course appeal from this order, or prosecute the bill of indictment in issue; if it fails to take a timely appeal, or if it does not appeal and fails to take timely action in prosecuting this matter, relator may file with the Court a petition requesting additional relief.