Louis Anthony **LOGNER**, Petitioner,

v.

**STATE OF NORTH CAROLINA,**
Respondent.

No. C–130–G–66.

United States District Court
M. D. North Carolina,
Greensboro Division.

Nov. 29, 1966.

Norman E. Williams and Richard M. Hutson, II, Durham, N. C., for petitioner.

Thomas Wade Bruton, Atty. Gen. of North Carolina, and Theodore C. Brown, Jr., Staff Atty., North Carolina Dept. of Justice, Raleigh, N. C., for respondent.

## MEMORANDUM OPINION

GORDON, District Judge.

The petitioner, Louis Anthony Logner, a prisoner of the State of North Carolina, hereinafter referred to as petitioner, has filed with this Court a petition for a writ of habeas corpus pursuant to the provisions of Title 28 U.S.C. § 2241 and § 2254. The petitioner contends that:

1. The admission of incriminating statements obtained while he was illegally detained without the benefit of counsel and while he was in an extreme state of intoxication due to over-indulgence in alcohol and narcotics was a violation of the due process requirements of the Constitution of the United States.

2. His state of intoxication at the time of the alleged incriminating statements was such as to deprive him of any meaningful capacity to make a free and intentional choice to incriminate himself.

972

(3.) The state court's application of the standard of voluntariness, which primarily considered the reliability of the confession as the test for its voluntariness and not the "totality of circumstances," denied him the correct constitutional standard of voluntariness required by due process under the Fourteenth Amendment.

The petitioner was tried for the offense of safecracking and safe robbery at the July, 1965, Special Criminal Term of the Superior Court, Durham, North Carolina. The petitioner was found guilty on his plea of not guilty and sentenced to not less than ten nor more than fifteen years in prison.

On the night of November 16, 1964, thieves broke into the office of the McCracken Oil Company in Oxford, North Carolina. They removed the safe containing over $10,000.00 in cash and checks from its concrete foundation and carried it away. At the petitioner's trial in connection with this offense the state offered into evidence certain alleged statements petitioner made on November 18, 1964. The petitioner objected to the use of these statements. He contended that he was so intoxicated at the time that all such statements were involuntary, and that any waiver of his constitutional rights had been ineffectual. The trial judge, in the absence of the jury, heard evidence and made specific findings of fact as to the confessions and determined that all were voluntary under the applicable standards. After the judge had determined that the statements were admissible, the evidence which had been heard to determine their admissibility was repeated in more detail before the jury.

After the finding of guilty, the petitioner appealed to the Supreme Court of North Carolina, objecting to the use of these statements. In the decision, State v. Logner, 266 N.C. 238, 145 S.E.2d 867 (1966), the Supreme Court held that the evidence supported the trial judge's findings that the defendant's statements to the police were voluntary and that the defendant had been advised of his constitutional rights to remain silent and to be represented by counsel.

After certiorari to the Supreme Court of the United States was denied in Logner v. North Carolina, 384 U.S. 1013, 86 S.Ct. 1983, 16 L.Ed.2d 1032 (1966), the petitioner filed a petition for a writ of habeas corpus in this Court on July 12, 1966.

Even though a full factual hearing had been given in the trial court on the contentions of the petitioner now before us, a plenary hearing was granted and was held in Durham, North Carolina, on October 20, 1966. From the testimony at the hearing and from consideration of the transcript from the original trial in the Superior Court of Durham, North Carolina, the following facts were developed.

Petitioner at the time was forty-three years of age. He had recently been released from prison in June of 1964. He has had a serious drinking problem since childhood. Petitioner started drinking at the age of six or seven and will drink anything with any alcoholic content; it makes no difference. In addition, he takes stimulants of all kinds in large quantities. He has a number of arrests for public drunkenness and the records of Duke Hospital reflect treatment for alcoholism in 1954.

On the date in question, November 18, 1964, the petitioner had been drinking and taking stimulants over an extended period of time. That particular morning, in addition to consuming liquor, petitioner had been taking Syndrox, an amphetamine, in large quantities. At about 11:30 A.M. on November 18, 1964, Detectives Hartley and Morris of the Police Department of the City of Durham, observed the petitioner in downtown Durham and noted that "he wasn't walking like a sober man." The officers thought the petitioner was drunk, but not drunk enough to warrant being arrested for public drunkenness. However, when he drove away in his car, they followed him fearing an accident might result. Their apprehension was justified, because the petitioner had gone only two or three

blocks before he was involved in a traffic accident. After failing to negotiate a left turn properly, he hit two cars in the line of approaching traffic. The police officers were immediately behind the petitioner and observed the wreck take place. The driver of one of the cars in the accident testified that the petitioner was obviously drunk and was even unable to put his car in reverse to back away from the cars with which he had just collided. Also, that he had to be assisted from his car by the police officers when he was taken to their car.

Detectives Morris and Hartley called for a patrolman to investigate the accident and took the petitioner into custody for driving under the influence. Patrolman Watson, who investigated the accident, noted in his report, "The driver of Vehicle # 1 (petitioner) was drunk and was unable to give a statement as to what happen (sic)."

Once in the police car, the petitioner stated to the effect that he could pay for the damage to the other cars and that they (meaning the police officers) knew where the money came from. At this time, the petitioner was in custody for drunken driving only, and was not in custody for safe robbery, although the police officers admitted the petitioner would have to be a natural suspect in any safe job. After this initial statement by the petitioner, the officers stated that the petitioner was warned of his rights to remain silent and to have counsel.

When the petitioner arrived at the police station, he was not placed in jail after the initial processing, but was taken to an interrogation room. One of the police officers stated that the purpose in taking the petitioner to the interrogation room was to amplify the statements the petitioner had made earlier in the patrol car. Both officers testified the petitioner was under the influence of intoxicants at this time. Further warnings as to his constitutional rights were repeated and to this the petitioner replied, "I can tell you anything I want to. You still have to prove it." After some questioning the petitioner made a statement implicating

himself in the McCracken Oil Company robbery and a local safe robbery at the residence of one Johnson on Indian Trail Road in Durham. This initial interrogation lasted approximately thirty minutes, from 12:00 to around 12:30 P.M.

About 2:30 P.M. the same date, the prisoner was interrogated again by the same two police officers. In response to an accusation that the petitioner was given liquor by the police, one police officer testified, "He didn't need any liquor to loosen him up, he was already gone." With encouragement, the petitioner repeated his earlier statement implicating himself in the two safe robberies and told the police officers that he could show them where a safe was located. So the two police officers left the police station and made a trip to Orange County, in the vicinity of Murphy School. The petitioner could not locate the safe from the McCracken Oil Company. During this search, petitioner was confused and unsure of the location of the safe. Both officers testified that they had little patience with the petitioner because he was drunk. On the way back to town, the petitioner brought up the Johnson safe again and directed the officers to where it was located.

At approximately 7:30 P.M. that night, the petitioner was interrogated for a third time in one of the interrogation rooms at the Durham Police Station. On this occasion there were four law enforcement officers present, the two police officers who had been with the petitioner all day, plus the Police Chief of the City of Oxford and a Special Agent from the State Bureau of Investigation. The S.B.I. agent testified that upon his arrival the petitioner was warned as to his right to remain silent and his right to counsel. The Police Chief and the S.B.I. agent testified that the petitioner had been drinking previously and that he had an odor of alcohol about him; that his eyes were red and his hair was mussed and out of place. The officers testified that at this time the petitioner asked repeatedly that he be given a drink. This period of interrogation lasted until

around midnight and during the course of the questioning, the petitioner made the same statement that he had made earlier to the other police officers; however, the petitioner had not previously made a written statement and refused to sign one at that time.

The next morning, November 19, 1964, the petitioner was taken from the Durham Jail for a second trip to Orange County for the purpose of finding the McCracken Oil Company safe. At this time, the petitioner was suffering from an acute hangover after his extended drunk and was noticeably nervous and sick. After a search of three or four hours, the safe was finally located.

It was not contended that the petitioner made further incriminating statements on November 19, 1964. He simply accompanied the officers to Orange County and after considerable search they were able to locate the McCracken Oil Company safe. All the incriminating statements in question were made on November 18, 1964.

On the basis of these facts, the Court grants the relief requested by the petitioner for the reasons hereinafter set forth:

The first two contentions of the petitioner would seem to be interconnected and will be joined for discussion purposes. The basic contention is that the petitioner's state of intoxication rendered his statements involuntary under the applicable standards and the admission of these statements was a violation of due process. With this contention the Court is in agreement.

■ The dictate of the Fifth Amendment of the Constitution commanding that no person "shall be compelled in any criminal case to be a witness against himself" reminds us that our system of criminal prosecution is accusatorial, not inquisitional; that is, "a system in which the State must establish guilt by evidence, independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961).

The danger inherent in a system without our constitutional safeguards is noted in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964):

"We have learned the lesson of history, ancient and modern, that a system of criminal law enforcement which comes to depend on the 'confession' will in the long run, be more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation."

A federal standard for determining the voluntariness of confessions was formulated in Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), and the basis for the standard was the protection offered by the Fifth Amendment. A marked shift to the federal standard in state cases began with Lisenba v. People of State of California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166 (1941), and culminated in Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) where the court stated:

"We hold today that the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgement by the States. * * * The Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in an unfettered exercise of his own will * * * "

■ Consequently, the federal and state courts are bound by the same standards. If a confession would be offensive in a federal court, because it is not the "unfettered exercise of his own will," it should also be offensive to the state court.

■■ If such a confession which offends due process forms any part of the basis for a criminal conviction, then the conviction cannot stand. As the Supreme Court said in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964): "[I]t is now axiomatic that a

defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, Rogers v. Richmond, 365 U.S. 534, 81 S. Ct. 735, 5 L.Ed.2d 760, and even though there is ample evidence aside from the confession to support the conviction." (citations omitted)

■ In this proceeding the Court is not called upon to decide the guilt or innocence of the petitioner. The question before this Court is whether the petitioner's conviction and subsequent imprisonment were within due process if the confessions admitted at his trial were involuntary.

■ Numerous decisions of the Supreme Court have established the standards governing the admission of confessions into evidence. The issue of voluntariness must be resolved by this Court after a careful scrutiny of the facts and circumstances without being bound by the findings of the state court. This procedure was formulated in Davis v. State of N. C., 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966) and reaffirmed recently in Smallwood v. Warden, 4 Cir., 367 F.2d 945 (1966), where it was established that the court had the duty to make an independent determination of the ultimate issue of voluntariness.

With reference to a standard for voluntariness, the Court in Davis v. State of North Carolina, supra, said:

"The standard for voluntariness which has evolved in state courts under the Due Process Clause of the Fourteenth Amendment is the same general standard which applies to federal prosecutions—a standard grounded in the policies of the privilege against self-incrimination. Malloy v. Hogan, 378 U.S. 1, 6–8, 84 S.Ct. 1489, 1492–1493, 12 L.Ed.2d 653 [658, 659] (1964)".

The standard of voluntariness has been steadily changing, flowing in the direction of restricting the admissibility of confessions obtained by questionable practices. Beginning with Brown v. State of Miss., 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1935) which was the first case where the Supreme Court held that the Due Process Clause prohibited the states from using the coerced confession of an accused against him, the courts have become stricter in admitting confessions and more liberal in construing the privilege against self-incrimination. The courts have not hesitated to strike down any rule or decision in this area, which is inconsistent with individual liberty and due process.

The rationale of these decisions would surely hold that the confessions made by the petitioner in this case are offensive to due process and thus inadmissible. The essential fact that the petitioner was under the influence of alcohol and drugs to such an extent as to affect his judgment and that he was interrogated in that condition would render the statements involuntary.

The facts leave little doubt as to the petitioner's state of intoxication. He was arrested for driving under the influence. The investigating officer noted he was too drunk to make a statement. At the initial interrogation the officers admitted the petitioner was intoxicated.

At the second interrogation, one police officer stated the petitioner was already gone. Later that afternoon both officers had little patience with the petitioner because he was drunk.

At the third interrogation of the day, which lasted from before 7:30 P.M. to midnight, the fact that the petitioner was still under the influence was apparent to all present.

In each of the three interrogation sessions, the petitioner was admittedly in some state of intoxication, and while he was in this state he was interrogated for the purpose of eliciting a confession. This state of intoxication prevented the petitioner from making a confession which could be considered voluntary.

As was stated in Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961):

"No single litmus paper test for constitutionally impermissible interrogation has been evolved * * * [t]he ultimate test remains * * * the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760. The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession."

Using this test the petitioner's confession was not admissible.

A person "under the influence" has been defined in State v. Carroll, 226 N.C. 237, 240, 37 S.E.2d 688, 691 (1946) as "[one who has lost] control of his bodily or mental faculties, or both, to such an extent that there is an appreciable impairment of either or both of these faculties." Since the petitioner was charged with driving under the influence, the arresting officers obviously were of the opinion that his faculties were so impaired.

Was this confession the product of an "essentially free and unconstrained choice of its maker?" This Court must answer in the negative. Any decision to incriminate made in the intoxicated state of petitioner could not be free and unconstrained. A person who has lost control of his mental faculties is incapable of making an admissible confession. The petitioner's will had been overborne by the alcohol and drugs. Whether he had a false sense of confidence as evidenced by his statement that they would still have to prove anything he said or an acute sense of remorse, his capacity for self-determination was critically impaired, rendering any confession gained objectionable.

By the applicable standards, a confession is not voluntary simply when it is shown that it is not produced by a promise or threat. A confession is voluntary in law if, and only if, it is voluntarily made. Ziang Sung Wan v. United States, 266 U.S. 1, 45 S.Ct. 1, 69 L.Ed. 131 (1924).

As Chief Justice Warren said in Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963):

"If an individual's 'will was overborne' or if his confession was not the product of a rational intellect and a 'free will' his confession is inadmissible because coerced."

Coercion can be mental as well as physical. Blackburn v. State of Alabama, 361 U.S. 199, 206, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960).

Petitioner's statements were not made in an atmosphere favorable to the petitioner. He was not a drunk who staggered up to the policeman on the corner and made incriminating statements. The petitioner was under arrest. He was in custody, and, after making initial incriminating statements, underwent custodial interrogation.

A confession made by one in the petitioner's state of intoxication could not be the product of a rational intellect and a free will. Indeed, it is a paradox that the petitioner could not make a statement concerning the accident because he was too drunk, yet he was capable of making statements that put him in prison.

The contention that the statements were voluntary as the petitioner was warned of his right to remain silent and of his right to counsel and that he waived these rights is without merit. As stated by Justice Black in Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1937):

"Courts indulge every reasonable presumption against weaver of fundamental rights and that we 'do not presume acquiescence in the loss of fundamental rights.' A waiver is ordi-

narily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver * * * must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused."

 The accused may always waive his rights, but this waiver must be made voluntarily, knowingly, and intelligently. Escobedo v. State of Illinois, supra.

 However, no such waiver can be said to have taken place in this case. The petitioner in his condition was incapable of acting knowingly or intelligently. Once in custody and when the investigation had focused on the petitioner as the accused, at that moment a cloak of constitutional rights enveloped the petitioner. This cloak could only be removed by some affirmative action on the part of the petitioner and at the time the petitioner was incapable of any such affirmative action. Even though the petitioner in his intoxicated state might attempt to waive his constitutional rights to remain silent or to have counsel, the waiver would have to be ineffectual because the petitioner's judgment was impaired. To waive his constitutional rights, the petitioner must be capable of doing so in a voluntary, knowing, and intelligent manner. The petitioner was not in that position.

 Without an effective waiver, the petitioner had a constitutional right to remain silent. Therefore, any questioning by police officers which in fact produced a confession which was not the product of a free intellect renders that confession inadmissible. Townsend v. Sain, supra. As stated before, the fact that the confession is true or that the petitioner is guilty does not remove the fact that the confession was obtained through improper methods and therefore offends due process. If the confession offends due process, then the conviction, which is based in any part on such confession, cannot be allowed to stand.

 Since the relief requested by the petitioner has been granted on his first and second contentions, protracted discussion of this third contention is unnecessary. However, the Court feels obligated to comment on it. The contention simply stated is that the North Carolina test for voluntariness as applied in the case uses reliability as the standard. The petitioner contends that this clearly falls within the class of the unconstitutional standard of voluntariness prohibited by the Supreme Court in Rogers v. Richmond, supra.

In *Rogers* the Court held that the application by the trial court of a standard of voluntariness "infected by the inclusion of references to probable reliability" was an unconstitutional standard by which to determine voluntariness.

Sufficient to say that we do not agree with this contention of the petitioner. In the *Rogers* case the Court had made specific statements that voluntariness should be viewed in terms of truthfulness. In a review of the applicable North Carolina cases, there is no such specific reference to truthfulness, reliability, or trustworthiness. Therefore, the North Carolina standard of voluntariness would not seem to fall within the prohibition of *Rogers*.

This case focuses attention again on the ever present problem in the administration of justice of the difficulty involved in trying to balance and reconcile the rights of a defendant, even though guilty, to be tried consistent with constitutional protections, and the obligation of law enforcement personnel to investigate and bring before the courts those in violation of the law.

For the reasons stated, it is concluded that the verdict of guilty and the judgment pronounced thereon should be vacated and set aside. The State may, if it so elects, retry the petitioner, provided such action is taken within six months. Otherwise, the petitioner will be discharged.