**UNITED STATES of America ex rel. John R. WAKELEY**

**v.**

**H. E. RUSSELL, Superintendent. Misc. No. 69–284.**

United States District Court, E. D. Pennsylvania.

Feb. 25, 1970.

Louis M. Natali, Jr., Philadelphia, Pa., for petitioner.

Joseph J. Musto, Asst. Dist. Atty., Philadelphia, Pa., for respondent.

## OPINION AND ORDER

JOHN W. LORD, Jr., Chief Judge.

Relator, John R. Wakeley, filed the present petition for a writ of habeas corpus seeking relief from a 1963 conviction for second degree murder arising from the stabbing death of Mrs. Lillian Hines during an altercation on November 1, 1960. After pleading guilty to this offense, relator was sentenced to a term of 10 to 20 years. His minimum sentence expires on November 3, 1970.

Relator took no direct appeal at the time of his conviction. However, on January 14, 1965, relator instituted a state action in habeas corpus which was dismissed by the lower court. An appeal was filed but later discontinued.

Thereafter, on June 29, 1965, relator filed another habeas corpus petition which was also dismissed. The Supreme Court of Pennsylvania affirmed that

dismissal. Commonwealth ex rel. Wakeley v. Myers, 421 Pa. 18, 218 A.2d 335 (1966). Subsequently, relator filed a petition for habeas corpus in this Court (Misc. No. 3490), and the Court, in effect, granted relator the right to appeal *nunc pro tunc* with counsel. The Pennsylvania Supreme Court, considering, inter alia, the issues now presented, affirmed relator's conviction. Commonwealth v. Wakeley, 433 Pa. 159, 249 A.2d 303 (1969). Having thereby exhausted his state court remedies, relator instituted the instant action in this Court.

A full evidentiary hearing was held by this Court for the consideration of relator's contentions and briefs have been submitted on behalf of the relator and the Commonwealth. The matter is now ripe for determination.

Relator asserts two grounds upon which he seeks a writ of habeas corpus. He claims first that the confession given by him to the police was involuntary and that this involuntary confession induced relator's guilty plea. Secondly, he claims that even if his confession were voluntary, his guilty plea was involuntary, because it resulted from coercion on the part of his counsel.

In order to be valid, a guilty plea must be made knowingly, intelligently and voluntarily. Machibroda v. United States, 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962). The resolution of this issue calls for an analysis of all of the relevant facts on a case by case basis. United States ex rel. Crosby v. Brierley, 404 F.2d 790 (3rd Cir. 1968); United States ex rel. Black v. Russell, 306 F.Supp. 270 (E.D.Pa.; Opinion filed November 24, 1969). Important factors to be taken into consideration include: (1) the relator's age and background; (2) the trial counsel's familiarity with the law; (3) the consistency, or lack of consistency in the pleas made throughout the pretrial and trial stages of the case; and (4) the relator's opportunity to consult with his trial counsel. United States ex rel. Crosby v. Brierley, *supra*; United

States ex rel. Black v. Russell, *supra.* Accordingly, a summary of the background of the relator and factual circumstances culminating in the guilty plea in the instant case will be helpful.

At the time of the incident here in question, relator was twenty-seven years old and unemployed, and had been without steady employment for some five years (N.T. 6–7).[1] He had attended high school until the tenth grade, but had quit at age fourteen in order to work to support his family (Trial N.T. 51;[2] N.T. 8). His mother was a cripple, and his father, two uncles and an aunt were alcoholics (N.T. 10, 138). His father, one uncle, and the aunt have by now all died in their fifties, at least one definitely as the result of alcoholism (N.T. 138).

Wakeley began drinking with his father when he was fourteen years old (N.T. 8). However, he became an electrician and worked steadily until 1955, when he had an auto accident near Peekskill, New York (N.T. 7). As a result of this accident he suffered a brain concussion and facial injuries which resulted in his hospitalization. (N.T. 7).

After the accident Wakeley ceased steady employment and became an extremely heavy drinker (N.T. 7). He fell into a pattern of spending most of the day drinking at his home and in local taverns (N.T. 8–11). He supported himself by doing odd jobs and by frequently selling his blood (N.T. 8, 12–14). During 1960, he donated blood on at least fourteen occasions (Trial N.T. 30). During 1959, he twice attempted suicide, once by slashing his wrists and once by disconnecting the gas pipe of a stove and locking himself in the room containing it (N.T. 20–22).

On the day of the incident in question, relator testified that he began the day by consuming a pint of whiskey and a quart or so of ale (N.T. 11). After carrying his crippled mother downstairs, he testified that he went to a local bar and continued drinking, consuming some four or five quarts of ale and some wine (N.T. 11–12). At about 1 o'clock he went home, took a shower and then went back to the bar about 2 o'clock. Thereafter, he attempted to sell blood at Penn Center Plaza, but was refused because the agency would not accept blood of his type (N.T. 13). He testified that he next went to the City Grille and had a few beers (N.T. 13). He testified that he then went to a local blood bank and sold a pint of blood for five dollars (N.T. 13). Next he purchased a half pint of gin and returned to the bar near his home (N.T. 14–15). He said that he stayed at this bar and drank until he felt that he ought not remain to drink further because he judged from the bartender's conduct based on his previous experience that the latter felt that he (Wakeley) had had too much to drink (N.T. 15–16).

Wakeley testified that he then went to the home of a Mrs. Hines, whom he knew, and consumed some more gin, sharing the bottle with Mrs. Hines, who drank most of it (N.T. 16). An altercation, the details of which are not entirely clear, followed, and resulted in the death of Mrs. Hines by stabbing and strangulation[3] (Trial N.T. 5–6).

Relator left the home of Mrs. Hines, apparently in a dazed condition and returned to his home (N.T. 17). He testified that he advised his brother that he thought he had hurt someone (N.T. 17). They decided to go to see his uncle to seek advice as to what he should do (N.T. 18). On the way they stopped at a taproom and drank more whiskey (N.T. 18–19). While he was at his uncle's, his brother went back to pick up his father (N.T. 19). He and his uncle drank beer,

1. Reference to "N.T." indicates the hearing held in this Court.

2. Reference to "Trial N.T." indicates the trial proceedings in the state court.

3. The Medical Examiner's report introduced at the time of trial also indicated that acute ethyl alcoholism was a cause of death.

and he told his uncle that he thought he had stabbed someone (N.T. 19–20).

Relator testified that as a result of this discussion, he, his father and his uncle went to the 16th District Police Station at 39th Street and Lancaster Avenue in Philadelphia. He testified that he first spoke to a sergeant and then to a lieutenant (N.T. 22–23). He testified that he told the lieutenant that he had been in some trouble and had a fight at 712 DeKalb Street (N.T. 23). However, the Commonwealth brought out at the time of trial that the lieutenant thought Wakeley was another drunk coming in and making up a story, and having no independent information as to any incident, sent him home without investigating the matter further (Trial N.T. 15–16).

From the police station relator, his father and his uncle went to a bar across the street to call relator's brother to come to pick them up (N.T. 24). Relator testified that the call was made about 2 o'clock A.M. and relator's brother testified that he came about that time and picked the others up and drove them home (N.T. 24–25, 147). Relator testified that he and the others continued drinking at the bar while waiting for his brother to arrive (N.T. 24–25).

Upon his arrival at home, relator passed out on the couch with all his clothes on (N.T. 147). Relator's brother testified that relator was awakened between 3:00 and 3:30 A.M. by the police by shaking him for several minutes and was then handcuffed (N.T. 148–149). According to the testimony of relator's brother and Police Detective George Busch, relator and his brother were taken to the West Detective Division at 55th and Pine Streets, though relator testified that he had no recollection of being at 55th and Pine (N.T. 150–151, 170). The next thing relator remembers is awakening at City Hall in the Homicide Division where he was subjected to a rather lengthy interrogation (N.T. 26–42). Relator testified that he was told that Mrs. Hines was alive and not seriously hurt and would not press charges (N.T. 32). Detective Busch testified that it was common police practice at the time relator was interrogated deliberately not to inform the suspect in homicide cases that the victim was dead (N.T. 187). Relator testified that he had asked for a lawyer, Benjamin Pomerantz, but was told that his brother was handling this matter (N.T. 29–31). He testified that he also asked to be taken to a cell to sleep but was told that he would be permitted to do so after completing a statement (N.T. 31). Relator's brother testified that he saw relator in a men's room in City Hall just prior to relator's giving his statement (N.T. 152). Relator's brother testified that relator's eyes were very bloodshot, his face fatigued, and his clothes disheveled, and that he doubted relator recognized him (N.T. 152–153). Detective Busch, who attended all the interrogations of relator, stated that when he first observed relator, relator was, in his professional opinion, intoxicated (N.T. 178–179). Detective Busch stated that relator had an odor of alcohol, and that his clothes, movements, and overall appearance definitely showed on the basis of his 15 years' experience in the Police Department, that relator was drunk (N.T. 178–179).

The Commonwealth offered no evidence to rebut any of the above testimony of relator or his brother. As is evident above, the Commonwealth's only witness, Detective Busch, who attended but did not participate in the interrogation, corroborated much of the evidence produced on behalf of relator. The Commonwealth did not call the interrogating officers, Detectives Arnold and Foglietta who did not appear for health reasons.

Relator testified that he was repeatedly asked at City Hall whether the incident could have happened in one way or another, and that he stated that it could have happened in any of several ways (N.T. 34). Relator originally gave an oral statement at West Detective Division according to the testimony of Detective Busch, but this statement was

not transcribed, though equipment for this purpose was available there (N.T. 180). Then at City Hall, the interrogating detective, Detective Arnold would phrase questions to relator and relator would answer, both question and answer being taken down by a typist (N.T. 188). Relator signed the typed statement so prepared.

Initially, two counsel were appointed by the Court to represent relator, Charles L. Guerin, Jr. and Joseph L. Ehrenreich (N.T. 104). At a hearing before Judge Waters in May of 1962, relator stated that he wanted new counsel, because Mr. Guerin and Mr. Ehrenreich wanted him to plead guilty and he did not feel such a plea was appropriate (N.T. 48–49). His request was denied, but after he renewed his request at a later hearing before Judge Alexander, it was ultimately granted (N.T. 57). Judge Alexander appointed Paul M. Chalfin (now Judge Chalfin) and Richard Knox to represent relator.

Both relator and his brother testified that in all their discussions with the four Court appointed attorneys, relator's confession was of paramount importance in their consideration of his case (N.T. 45, 54, 159–161). Relator testified that all counsel recommended that relator plead guilty, emphasizing the fact that he would look ridiculous at a jury trial when he gave a version of the events contradicting his confession (N.T. 45, 54, 58–59, 61, 63). Mr. Knox similarly testified that the confession was the prime if not sole motive behind the advice given relator by himself and Mr. Chalfin that relator should plead guilty (N.T. 118). While relator told Mr. Knox that he was very intoxicated when he gave the statement and felt that he had only stated various ways in which the incident could have occurred, Mr. Knox[4] testified that he was not aware of any possible pretrial procedure for challenging the confession in the state courts prior to Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (N.T. 122–123).

The Third Circuit has set forth the rule governing a decision as to the voluntariness of a guilty plea where it is alleged to have been induced by an involuntary confession in the case of United States ex rel. Collins v. Maroney, 382 F. 2d 547 (3rd Cir. 1967). There the Court stated at page 548:

The issue has four facets. First, it must be decided whether by the plea of guilty, Collins [relator therein] waived his right to question the constitutional infirmity of his confession. This question is controlled by federal law. Second, if it is found that Collins did not waive his right to challenge his confession it will be necessary to determine whether the confession was coerced. Third, if the confession is found to have been coerced it will have to be determined whether the coerced confession induced and thus tainted Collins' guilty plea. Fourth, assuming that a coerced confession did not induce the plea of guilty, it must be decided whether the plea of guilty was voluntary. If the plea is found to have been voluntary, the conviction may stand.

■■■■ The first question, then, is whether Wakeley waived his right to challenge any constitutional infirmity with respect to his statement. To constitute waiver for the purposes of a federal habeas corpus proceeding, the Commonwealth must show on the part of relator an intentional relinquishment or abandonment of a known right or privilege. Fay v. Noia, 372 U.S. 391, 439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). In the instant case the Commonwealth offered no evidence to support a claim of waiver on the part of relator. On the other hand, relator testified that none of his attorneys told him that he could challenge the confession, and the Commonwealth of-

---

4. Relator's other trial counsel, Judge Chalfin, did not appear at the hearing by agreement of the parties.

fered no evidence to rebut this statement (N.T. 63). Under these circumstances there can be no possibility of waiver in the instant case.

■ This brings the Court to the second question set forth above, that of whether relator's statement was voluntary. The test applicable at the time of relator's conviction was that the statement be the product of a rational intellect and free will. Blackburn v. Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). This standard has been applied to the case of a person who is intoxicated at the time of making a statement in the case of Logner v. North Carolina, 260 F.Supp. 970 (M.D.N.C.1966). In that case the court said that the controlling test was whether the confession was the free and unconstrained choice of its maker. Id. at 976. In that case the court pointed out that the petitioner had had a drinking problem since childhood and by the date in question had been drinking and taking stimulants over an extended period of time. Id. at 972. On the morning of the day on which petitioner had given his statement two police detectives had observed the petitioner and concluded that he was not walking like a sober man, though they did not feel he was drunk enough to be arrested for public drunkenness. Id. at 972. However, the officers followed the petitioner when he drove away in his car because they feared an accident, and in fact an accident did follow. Id. at 973. The patrolman who investigated the accident concluded that the petitioner was too drunk to give a statement as to what happened. Later in the same day, after the petitioner had made some statements implicating himself in a robbery, petitioner was interrogated and at the third interrogation gave a statement admitting the robbery, though the police officers admitted that during the interroga-

tions petitioner was still in some state of intoxication. Id. at 975. The court stated on the basis of these facts that the petitioner's confession was not the product of a free and unconstrained choice of its maker. Id. at 976. It concluded that a confession made by one in the petitioner's state of intoxication could not be the product of a rational intellect and a free will. Id. at 976. The court pointed out that it was indeed a paradox that petitioner could not make a statement concerning the accident because he was too drunk, yet was capable of making statements that put him in prison. Id. at 976. Accordingly, the court ruled that petitioner's statement was involuntary.

■ The Court views the instant case as remarkably similar to the *Logner* case. Without repeating all of the facts previously set forth, the Court concludes that those facts bring relator's statement clearly within the ambit of the *Logner* case. Here, as there, the petitioner had a history of drinking dating from childhood. Here, as there, prior to the day in question, petitioner had been drinking heavily over an extended period of time. Here, as there, petitioner had been consuming large quantities of liquor on the day in question. (Here also for the 5 previous days from his birthday October 27, on.) Here, as there, a police detective present at the interrogation had absolutely no difficulty in determining that relator was drunk. And here too it would be paradoxical that when relator in his condition on the night in question made a statement to a police lieutenant that he thought he had hurt someone at a specific address, the lieutenant thought he was just another drunk making up a story and sent him on his way without further investigation, and yet on the same night he was capable of giving a confession which effectively put him in jail.[5] Accordingly,

5. The thorough report, introduced at trial by the Commonwealth, of Dr. Baldwin Keyes, the court-appointed psychiatrist, is also worth noting in this connection.

In that report, Dr. Keyes stated with respect to Wakeley's claim that he did not remember the details but indicated that the events could have occurred as suggest-

the court concludes that relator's statement was not the product of a rational intellect and free will and was therefore involuntary. See also United States ex rel. Collins v. Maroney, 287 F.Supp. 420 (E.D.Pa.1968) in which Judge Higginbotham of this Court in a thorough and very persuasive opinion reached a similar result with respect to an analogous problem.[6]

We now come to the third question outlined above, that of whether relator's involuntary confession induced and thereby tainted his guilty plea. The Court concludes that it did.

The presence of the confession was paramount in the discussions of relator and his brother with all four of his attorneys during the course of the preparation of relator's case. Mr. Knox testified that basically the whole case was the confession (N.T. 118), and that without the confession his advice to his client would have been different in that they could then have reasonably faced the possibility of a jury trial, while with the confession he felt that such a course of action would have been foolhardy (N.T. 120). It was repeatedly stressed to relator that he would look foolish on the stand contradicting his prior statement and that in light of the confession he had no choice but to plead guilty.

It is also worth noting that the independent evidence of the Commonwealth was somewhat limited. While there were witnesses who saw relator enter and leave the building, there were no witnesses to the offense itself. And while a fingerprint of relator was found in the apartment of the deceased, it was brought out at trial that relator had been in the apartment some 10 or more times prior to the date of the incident in question (Trial N.T. 18).

Under these circumstances and those set forth in the more detailed account, supra, the Court concludes that relator's confession motivated his guilty plea. Since the Court has also concluded that relator's confession was involuntary, the writ of habeas corpus must be granted. United States ex rel. Collins v. Maroney, 382 F.2d 547 (3rd Cir. 1967); United States ex rel. McCloud v. Rundle, 402 F.2d 853 (3rd Cir. 1968). Consequently, the Court does not reach the fourth issue set forth by the Third Circuit in *Collins*, that of whether aside from the confession the guilty plea could be considered voluntary and the related argument of the instant petitioner that his guilty plea was the result of coercion on the part of his counsel.

The Court wishes to express its gratitude to Louis M. Natali, Jr., Esq. for his diligent and thorough representation of relator without compensation.

## ORDER

And now, to wit, this 25th day of February, A.D. 1970, it is ordered that relator's petition for a writ of habeas corpus be and the same is hereby granted. It is further ordered that execution of the writ be stayed for 90 days to allow the Commonwealth to appeal this decision or to retry relator. Upon the expiration of 90 days, in the absence of such action on the part of the Commonwealth, the writ shall issue forthwith without further Order of this Court.

And it is so ordered.

---

ed by the interrogating detectives, that it was astonishing that a person who consumed the amount of alcohol Wakeley reported consuming could remember the details of his experience (page 2 of the Report).

6. Judge Higginbotham held that the fact that the relator had been under the influence of drugs at the time he gave his statement was sufficient to render his statement involuntary without regard to whether or not he was told that he could see a doctor after he made a statement.