**UNITED STATES of America**

v.

**Michael Allen BABB.**

**Crim. No. 77–303.**

United States District Court,
D. South Carolina,
Greenville Division.

April 12, 1978.

Thomas E. Lydon, Jr., U. S. Atty., for the District of South Carolina, Columbia, S. C., and William A. Coates, Asst. U. S. Atty., for the District of South Carolina, Greenville, S. C., for the United States of America.

Stanford E. Lacy, Asst. Federal Public Defender, Columbia, S. C., for Michael Allen Babb.

## ORDER

HEMPHILL, District Judge.

For decision here is the motion of the defendant, Michael Allen Babb, for an order suppressing a statement made November 2, 1977. For reasons set forth herein, defendant's motion is denied.

## STATEMENT OF FACTS

Defendant was indicted on November 8, 1977, in a one-count indictment charging him with armed bank robbery in violation of Title 18, United States Code, Section 2113(a) and (d). The alleged offense took place at the Saluda Valley Savings and Loan Association, Piedmont Branch, Piedmont, South Carolina on November 1, 1977. Through his court-appointed attorney, defendant made timely motions to suppress statements made on November 1, 1977 and November 2, 1977.

On November 1, 1977 Special Agent James W. Schempp of the Federal Bureau of Investigation was called to the Association by local authorities, arrived on the scene at approximately 3:20 p. m. When Schempp arrived, defendant was seated in an Anderson County Police car. After being cursorily briefed on the robbery by local authorities, Schempp, along with Sergeant Jack Cann of the Anderson County Police Department, talked to Babb. Schempp sat in the back seat of the car next to the defendant and Cann in the front seat. The car doors were open. Schempp presented a standard waiver of rights form which, by Schempp's admission, defendant read and signed. As Schempp was taking the statement, defendant remained seated in the car. Neither Schempp nor Cann detected any body odor or other unusual odors about defendant; both testified that Babb was dirty, unkempt and disheveled, and had gold flakes of what appeared to be paint on his face. Babb gave a detailed account of the robbery, reciting facts unknown to Schempp at the time of the interview.

Agent Schempp testified that he basically asked defendant to tell him what had taken place and defendant narrated the events. The Agent then read the statement to the defendant, who read and signed the statement himself. Agent Schempp testified that the details of the robbery given by the defendant were substantially the same as those Schempp later learned, with one omission.

Schempp testified that defendant appeared to understand what was happening; appeared to understand his questions; and responded rationally to the questions asked. While Agent Schempp observed that the defendant was dirty and had gold paint on his face, he testified he did not appear to be

under the influence of narcotics or intoxicants. This agent, who was seated beside the defendant in the back seat of the automobile, further observed that the defendant's eyes were clear and that there was no unusual odor about him.

Sergeant Jack Cann testified that he initially contacted the defendant in the car. He stated that no one attempted to question defendant because the Federal Bureau of Investigation had been alerted. When Agent Schempp arrived, Sergeant Cann briefed him on the basic facts of the robbery. Sergeant Cann concurred with Agent Schempp's testimony regarding the appearance and demeanor of the defendant. He also did not observe any unusual odor emitting from the defendant. Sergeant Cann was seated in the front seat of the car during questioning.

FBI Special Agents Oliver G. Halle and Michael J. Harrison transported the defendant from the Anderson County Jail to the office of United States Magistrate Jesse M. Ray on November 2, 1977. Agent Halle testified that during the ride he reminded the defendant of his right to remain silent, right to counsel, etc. He asked defendant if there was anything else he wanted to say about the robbery. The defendant then admitted that after robbing the savings and loan association, he re-entered the building and attempted to have intercourse with the lone female teller. Defendant had not mentioned this episode in his previous statement. Agent Halle stated the defendant was responsive to questions and did not appear to be under the influence of drugs or narcotics. Halle further stated that the defendant told him that he had a good night's sleep and felt fine. He noted no unusual odor about the defendant.

Defendant's grandparents, Mary and Henry Babb, were called by the defendant. Their testimony was essentially that defendant had been sniffing paint for over two years and that his behavior during these episodes was erratic. They further testified that defendant had been sniffing paint more often than usual the week prior to the robbery. Also, the defendant bought a can of paint the day of the robbery and was seen sniffing it. Mrs. Babb said she saw him stagger when he left the house before the robbery early that afternoon.[1]

Demoril Young testified that he was with the defendant on November 2, and gave him some "acid" that morning. He further testified that he was in the car with the defendant and Special Agents Halle and Harrison, and that these agents coerced the defendant's statement. It should be noted that the court recently sentenced Young to five years imprisonment for violation of the Dyer Act. Agent Harrison was the investigating agent. Furthermore, Young has prior convictions for grand larceny and admits to having a drug problem. This court observed Young's demeanor. He was not telling the truth.

The paint claimed to have been used by defendant contains the chemical toluene. Defendant generally used two brands of paint: American Standard Spray Enamel and Rust-Oleum. The government stipulated that American Standard Spray Enamel contains 33.9% toluol, which for our purposes is the same as toluene, and Rust-Oleum contains 57.24% toluene.

Defendant next presented to Dr. John C. Dunlap, a brilliant Columbia psychiatrist, who limits his practice primarily to patients between the ages of 13 and 20. He was qualified as having a great deal of experience in dealing with drug addicts, glue sniffers, and paint thinner sniffers. Dr. Dunlap testified that, depending on the dosage, toluene would cause a toxic psychosis. Based upon the evidence that he heard[2] at the hearing, the doctor was of the opinion

---

1. A part of this court's responsibility in the suppression hearing involved a determination of credibility. After listening carefully to both of these blood kin of defendant and noting the temper of their testimony, this court concludes they were exaggerating to protect defendant, and their testimony is unworthy of belief.

2. The doctor testified he could not be positive as to defendant's condition without observing him.

that if defendant had "sniffed as much as he claimed, he would have great difficulty in rendering a statement that would be the product of rational intellect and free will." The effect would be that the defendant's answers would be compulsive. Although the drugs could affect motor coordination, it was possible for defendant to sit and answer questions. The doctor also stated that in his examination of the defendant, Babb admitted to taking amphetamines the morning of the incident. The doctor further noted that the statement contained words that may not have been in the defendant's vocabulary and that he would not be able to give such a coherent statement if he were stone sober. Finally, the doctor examined a standard waiver of rights form identical to the one signed by the defendant and was of the opinion that the defendant would have great difficulty in reading and understanding the waiver of rights form if he were totally under the influence. The doctor observed that defendant, by virtue of the paint that he had sniffed, if he had taken the quantities claimed, would have an odor about him very much like an alcoholic would smell of alcohol. The agents testified positively that they detected no such odor, and one agent was sitting beside him. The agents also testified the defendant was extremely dirty and disheveled and yet they detected no body odor.

### DEFENDANT'S MOTION

The defendant has moved to suppress his statements on the grounds that at the time his statements were made they were involuntary. The defendant contends they were involuntary for several reasons:

1. The agent did not read or explain to the defendant his rights at the time the first statement was taken, and the defendant in his condition at the time could not have comprehended and appreciated the waiver of rights form that was given to him to read.

2. The defendant was under the influence of drugs at the time both statements were made and they were not the product of a rational intellect or free will.[3]

3. Assuming, *arguendo,* that the effect of the drugs taken had subsided by the time the second confession was given so that defendant's rational intellect and free will were not critically impaired, the relationship between the earlier involuntary confession and the subsequent confession are so close that the facts of one control the facts of the other, and the later confession is involuntary as a matter of law.

### CONCLUSIONS OF LAW

This court is not now called upon to decide the guilt or innocence of the defendant, but only to determine from the preponderance of the evidence whether the defendant's statements were voluntarily made. *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). The truth or falsity of a confession is not at issue here, for it is well established that the Fifth Amendment of the Constitution dictates that a defendant in a criminal case is deprived of due process when his conviction is based, in whole or in part, upon an involuntary confession. *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961).

The Supreme Court has established many standards for voluntariness.

No single litmus-paper test for constitutionality impermissible interrogation has been evolved * * * [t]he ultimate test remains * * * the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he is

---

**3.** This case presents a rather frightening picture. Anyone possessing criminal intent, if defendant's contention be adopted, can get himself "high" on narcotics, alcohol, "grass", heroin, sniffing paint, glue, or whatever, and claim his actions were involuntary. A criminal can usually get witnesses, especially relatives, to say *anything* to protect the criminal. The psychiatrist was brilliant, but his answers were of such candor as to inform the court that defendant would smell of his abuse, which he did not. No one testified defendant smelled at the scene of the crime or immediately thereafter.

willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process [cites omitted.] The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession. *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961).

In *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), the defendant, a 19-year old drug addict, confessed to five separate crimes on three different occasions over a period of days while under the influence of drugs given by a police physician to ease withdrawal symptoms. The Supreme Court, in suppressing each confession, noted there are numerous tests for establishing admissibility of confessions into evidence and applied the following standard:

> If an individual's "will was overborne" or if his confession was not "the product of a rational intellect and free will," his confession is inadmissible because coerced. These standards are applicable whether a confession is the product of physical intimidation or psychological pressure and, of course, are *equally applicable to a drug-induced statement.* 372 U.S. 307, 83 S.Ct. 754 [Citations omitted.] [Emphasis added.]

It is axiomatic that this standard would apply to defendant's ability to intelligently and knowingly waive his constitutional rights if this court were satisfied defendant was so drugged, which he was not. See, e. g., *Logner v. North Carolina,* 260 F.Supp. 970, 977 (M.D.N.C.1966).

■ The Ninth Circuit, in *Gladden v. Unsworth,* 396 F.2d 373 (8th Cir. 1968), using the standard set forth in *Townsend,* held inadmissible statements made while the subject was intoxicated. That court noted the same result would have been reached had the confession been drug induced.

> If by reason of mental illness, use of drugs, or extreme intoxication, the con-

fession in fact could not be said to be the product of a rational intellect and a free will, to use the test in *Townsend v. Sain,* it is not admissible and its reception in evidence constitutes a deprivation of due process. 396 F.2d at 380–381.

Likewise, the district court for the Middle District of North Carolina, in applying *Townsend,* suppressed confessions to two robberies made by an alcoholic. *Logner v. North Carolina, supra.* There, not only did Logner confess to taking two safes from local businesses, but subsequently led authorities to where the safes were discarded. These cases are distinguishable because the evidence presented does not convince this court defendant was under the influence of intoxicants, narcotics, or paint, at the time of the robbery, at the time of the statement, or in the car with the agent enroute to the Magistrate's Office.

■ For defendant's confession to be voluntary, and thus admissible, the government must prove by a preponderance of the evidence that his will was not overborne and that the confession was the product of a rational intellect. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). In resolving this issue the court must consider the "totality of the circumstances." *Boulder v. Holman,* 394 U.S. 478, 480, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969).

■ Even when it is contended that a confession was given under the influence of narcotics or other intoxicants, the central question of voluntariness remains the same. There is no rule mandating that all confessions under such circumstances are admissible. *Ortiz v. United States,* 318 F.2d 450 (9th Cir. 1963), *cert. den.* 376 U.S. 953, 84 S.Ct. 971, 11 L.Ed.2d 972 (1964). The question in each case remains whether, given the "totality of the circumstances," the confession was a product of free will and rational intellect.

## CONCLUSION

The test, here, is the voluntariness of the statement of the accused. It is apparent,

from the facts that he was fully advised, and signed the waiver. The totality of circumstances here so reveal. *United States v. Harden,* 480 F.2d 649 (8th Cir. 1973). Of course, the jury, on trial, has a right, an obligation, to pass on the issue, if there challenged. *Jackson v. Denno, supra.* There is nothing here to show the will of the accused was overborne or that his statement was coerced. See *U. S. ex rel. Hayward v. Johnson,* 508 F.2d 323 (3rd Cir. 1975). *Lutkins v. United States,* 391 F.Supp. 1328 (D.S.Dak.1975); *Fant v. Peyton,* 303 F.Supp. 457 (W.D.Va.1969).

This court finds as a matter of fact and concludes as a matter of law that the statements given were voluntary. Of course the facts before the jury may give a different light.

The Motion to Suppress is denied.

AND IT IS SO ORDERED.

